**CHELSEA COMMUNITY HOSPITAL, SNF, and Chelsea Community Hospital, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 310–81C.

United States Claims Court.

March 30, 1983.

Alan G. Gilchrist, Detroit, Mich., for plaintiff.

Glenn E. Harris, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

NETTESHEIM, Judge.

This case is before the court on cross-motions for summary judgment. The matter had been fully briefed as of August 16, 1982, and was assigned to this court by order entered January 25, 1983. Accordingly, supplemental briefs were invited addressing any authorities applicable to the case which came into existence after August 16, 1982. Plaintiffs made their filing on March 8, 1983, and defendant followed on March 10. Oral argument by conference call was heard on March 14, 1983.

## FACTS

Plaintiffs filed their Amended Petition on May 26, 1981, seeking an award of reimbursable costs for a lease for the years 1970–72 from Chelsea Medical Center ("CMC") to plaintiff Chelsea Community Hospital, SNF ("SNF"), and plaintiff sub-lessee Chelsea Community Hospital ("Chelsea"). The costs were alleged to be payable pursuant to the reimbursement provisions of the Health Insurance for the Aged Act, 42 U.S.C. §§ 1395–1395ll (1970) (the "Medicare Act"). Plaintiffs initially filed their suit in federal district court, *Chelsea Community Hospital, SNF v. Michigan Blue Cross Ass'n,* 436 F.Supp. 1050 (E.D.Mich. 1977), which found jurisdiction lacking over the action. Plaintiffs appealed, and the United States Court of Appeals for the Sixth Circuit ruled that the district court had jurisdiction over plaintiffs' constitutional claims, but that, if plaintiffs pursued relief in the nature of a money judgment against the United States, the district court should transfer the action to the United States Court of Claims pursuant to 28 U.S.C. § 1406(c) (1976). *Chelsea Community Hospital, SNF v. Michigan Blue Cross Ass'n,* 630 F.2d 1131, 1136–37 (6th Cir.1980). The record of the case was transferred to the Court of Claims on May 6, 1981.

Plaintiffs, providers of services furnished to patients covered by the Medicare Act, are non-profit organizations operating a

nursing home and hospital. These facilities were constructed by a Michigan co-partnership, CMC, on land CMC purchased for this purpose. On June 22, 1970, CMC signed a lease agreement with SNF. The amount of the lease payment was set by an independent appraiser. In turn, SNF on September 29, 1970, entered into a sub-lease agreement with Chelsea on the same terms. Thereafter, the lease was amended retroactively to January 1, 1970, to substitute a fixed rental payment per bed for the previous sliding scale based on actual occupancy. This change was made on the advice of the Internal Revenue Service in order to permit plaintiffs to qualify for tax-exempt status under the Internal Revenue Code. 26 U.S.C. § 501(c)(3) (1970).

Under the Medicare Act, periodic payments to providers of services to insured patients may be made either directly by the Secretary of Health, Education and Welfare ("HEW," now "HHS") or through a "fiscal intermediary"—a public or private organization that has contracted with HEW (HHS) to determine the proper amount of payments and to make such payments on behalf of the Government. Each provider of services may elect to be reimbursed either by such an intermediary or by HEW (HHS) directly. 42 U.S.C. §§ 1395g, 1395h. In the instant case, plaintiffs nominated Blue Cross Association ("BCA") to serve as fiscal intermediary. Previously BCA had entered into an agreement with HEW to perform such a function. BCA and Michigan Blue Cross Association ("MBCA") were parties to an agreement under which MBCA undertook to perform audits of various providers and determine the amount of payments to be made, with actual payment being made by BCA from funds advanced by HEW. MBCA began such an audit of plaintiffs in the spring of 1972.

The Medicare Act calls for the "reasonable cost" of services to be reimbursed according to regulations promulgated by the Secretary of HEW (HHS). 42 U.S.C.

§ 1395x(v)(1)(A). Reimbursement for rental expenses is included as part of costs. However, section 20 C.F.R. § 405.427 (1972) ("section 427"), provides that if an organization supplying the facility and receiving the rent is "related to the provider," the provider is reimbursed "at the cost to the related organization."

During the audit,[1] the auditors discovered that Dr. Michael Papo, the principal partner of CMC (the lessor) was also the medical director and administrator of both providers (plaintiffs lessee and sublessee). In 1970 Dr. Papo owned a two-thirds interest in CMC. The auditors also found that Dr. Papo had signed promissory notes on behalf of plaintiff SNF; had underwritten and guaranteed loans to both SNF and CMC, pledging his own residence as collateral; had paid property taxes for the providers; had guaranteed a lease agreement between one of the providers and a third party; and had check-writing authority for both plaintiffs.

On the basis of these and other factors, MBCA determined that Dr. Papo was in a position to influence the affairs of plaintiffs and concluded that the lessor/CMC and lessee/providers/plaintiffs were related by common control and that rental payments under the building lease were includable as allowable costs of the providers only to the extent of the lessor's costs of ownership, or $202,152—less than provided for in the lease.

Plaintiffs then requested a hearing on the MBCA's determination. The hearing officer issued a written decision, finding that the facts determined by MBCA's auditors were correct; that they established a "presumption" of common control; that the providers had failed to rebut this "presumption"; and that the reduction in costs allowed, therefore, was proper. *Chelsea Community Hospital, SNF v. Blue Cross Ass'n*, Medicare Provider Appeal Decision, No. 395, at 5–6 (undated).

---

1. Discussion of the audit findings, MBCA determination, and opinion of the hearing officer is paraphrased from the district court's opinion in *Chelsea Community Hosp., SNF v. Michigan Blue Cross Ass'n*, 436 F.Supp. at 1053–54, which provides a succinct, accurate rendition of these background facts.

## DISCUSSION [2]

Plaintiffs' motion for summary judgment makes six arguments: 1) that the determination of relatedness by the hearing officer was arbitrary and capricious because it was not supported by section 427; 2) that section 427 is impermissibly vague; 3) that the administrative decision is not supported by substantial evidence; 4) that the hearing was an unlawful delegation of the HEW (HHS) Secretary's authority; 5) that section 427 treats lease agreements differently than other relationships, thereby violating plaintiffs' rights under the equal protection and due process clauses of the U.S. Constitution; and 6) that the section 427 interpretation was an *ex post facto* appropriation of property rights in violation of the Constitution and Medicare Act.

In their briefs and oral argument, counsel for plaintiffs conceded that recent decisions by the Court of Claims and Supreme Court foreclosed relief on their constitutional claims, with one exception. This exception forms part of the essential issue presented to the court for resolution of the controversy—whether plaintiffs and CMC for the relevant years were related organizations under section 427. The regulation provides in pertinent part:

(a) *Principal.* Costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable costs of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.

(b) *Definitions.* (1) *Related to provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

\*     \*     \*     \*     \*     \*

(3) *Control.* Control exists where an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

(c) *Application.* (1) Individuals and organizations associate with others for various reasons and by various means. Some deem it appropriate to do so to assure a steady flow of supplies or services, to reduce competition, to gain a tax advantage, to extend influence, and for other reasons. These goals may be accomplished by means of ownership or control, by financial assistance, by management assistance, and other ways.

(2) Where the provider obtains items of services, facilities, or supplies from an organization, even though it is a separate legal entity, and the organization is owned or controlled by the owner(s) of the provider, in effect the items are obtained from itself. An example would be a corporation building a hospital or a nursing home and then leasing it to another corporation controlled by the owner. Therefore, reimbursable cost should include the costs for these items at the cost to the supplying organization. However, if the price in the open market for comparable services, facilities, or supplies is lower than the cost to the supplier, the allowable cost to the provider shall not exceed the market price.

Plaintiffs argue that CMC was unrelated and that a finding to the contrary would violate their substantive due process rights under the fifth amendment. Defendant rejoins that a showing that one person who owns or controls one of the two organizations and holds a high position in the other organization—that carries a possibility of control, although not express—is sufficient evidence of interrelatedness to invoke the regulation.

Plaintiffs brought their suit over six years ago. The original petition, only slightly modified, was refiled in the Court

of Claims on May 26, 1981. In the interim, decisions of our predecessor court and the Supreme Court have undermined plaintiffs' position, as plaintiffs counsel has—and must have—conceded. *See Schweiker v. McClure,* 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) (Part B Medicare payment review procedures do not violate due process); *Weinberger v. Salfi,* 422 U.S. 749, 776–77, 95 S.Ct. 2457, 2472, 45 L.Ed.2d 522 (1975) (possibility of abuse of social program justifies rational prophylactic measure to protect against occurrences, expenses, and other problems with case-by-case determinations and justifies inherent imprecision of the measure); *Erika, Inc. v. United States,* 225 Ct.Cl. 252, 634 F.2d 580, 591 (limitations on Part B reimbursement do not deny provider due process or equal protection) (1980) (en banc), *rev'd on other grounds,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982);[3] *Pasadena Hospital Ass'n v. United States,* 223 Ct.Cl. 72, 618 F.2d 728 (1980) (precluding a defense of reasonableness as to the price provisions of a contract between related organizations).

The parties disagree as to the standard of review which the court should apply to this case. Plaintiffs argue for review based upon substantial evidence, whereas defendant urges a narrower standard limited to a determination of whether the procedures or resulting determinations violated the Constitution or governing statute. Some confusion exists as to the standard to be applied. *See Jackson Park Hospital Foundation v. United States,* 228 Ct.Cl. 451, 659 F.2d 132, 135 n. 5 (1981). *Jackson Park* seemed to support the standard that factual determinations under the Medicare regulations will be upheld unless arbitrary, capricious, or unsupported by substantial evidence, whereas *Erika* seems to formulate defendant's more limited standard. 634

F.2d at 586. Despite the comment in *Jackson Park,* the court has applied the latter standard. *Spokane Valley General Hospital, Inc. v. United States,* 688 F.2d 771, 773 (Ct.Cl.1982); *Valley View Community Hospital v. United States,* 230 Ct.Cl. at ——, 679 F.2d 857, 863 (1982). The confusion may be more semantic than real, because the constitutional inquiry goes more to the evidence supporting the Government's action, in any event.

Plaintiffs proffer a four-part analysis of section 427 cases, placing all prior decisions of the hearing officer, intermediary appeal board decisions, and judicial decisions in three of the categories and the present decision alone in the fourth. In short, plaintiffs argue that no prior decision has gone as far as this one on the facts to find section 427 relatedness and that to hold that the facts establish relatedness in this case would not only be unprecedented, but would run afoul of the substantive due process concepts formed on the fifth amendment.

Plaintiffs' analysis is, as follows:

1) Situations wherein legal control exists between organizations, but historically has not been exercised;

2) Situations wherein legal control exists and historically has been exercised;

3) Situations wherein no legal or actual control exists, but where history demonstrates that control was exercised; and

4) Situations wherein no legal or actual control exists and no history of control can be shown. Plaintiffs argue that section 427 precedent has found relatedness in the first three but not in the fourth situation—the situation applicable to themselves.

Both parties look to *Valley View Community Hospital v. United States,* 230 Ct.Cl. ——, 679 F.2d 857 (1982), as a significant precedent guiding the decision in this case.

---

**3.** Defendant offers *Smith v. United States,* 228 Ct.Cl. 168, 654 F.2d 50 (1981), for the proposition that the district court's decision on constitutional claims in *Chelsea Community Hosp., SNF v. Michigan Blue Cross Ass'n,* 436 F.Supp. 1050, acts as a bar to consideration of those claims here. That decision is not a bar. The district court in *Chelsea* resolved against plaintiffs *in dicta* certain constitutional claims, 436

F.Supp. at 1061–65, while concurrently holding that it did not have jurisdiction to hear the case. On review the Sixth Circuit stated that "the practice of assuming jurisdiction arguendo cannot provide a meaningful review of constitutional claims." 630 F.2d at 1137. Thus, the district court's *dicta* do not bar this court from addressing the same claims.

The authorities cited by plaintiffs are not persuasive that the related organization principle of section 427 is inapplicable. *In re:* (names withheld), Medicare/Medicaid Guide, New Developments (CCH) ¶ 27,824 (Provider Reimbursement Review Board 1976) (hereinafter "(CCH)"), control was found not to exist, despite the fact that six employees of the lessor were on the 14-member board of the lessee/provider; however, this decision was reversed, *id.* ¶ 27,908 (Commissioner of Social Security 1976), on the ground that the lessor's potential to influence and direct the provider made the organizations interrelated. Potential to exert control is the root of section 427.

■ In *Home Health Agency of North Broward, Inc. v. Blue Cross Ass'n,* (CCH) ¶ 31,016 (Health Care Financing Administration Acting Deputy Administrator 1981), interrelation was found in a management contract where the president of the management company was also secretary/treasurer, director, and agent of the provider—a situation not far from the roles Dr. Papo played for plaintiffs in 1970–72. The court in *Medical Center v. Harris,* 628 F.2d 1113, 1118 (8th Cir.1980), stated that under section 427 only power to control need be present, not an exercise of power to control. That standard is the one the court has applied in this case. Plaintiffs' own authorities thus defeat their effort, because the prophylactic purpose of section 427 extends to situations wherein the power to influence or control exists, regardless of its exercise.

■ Moreover, a showing of the possibility and motive for insider influence is sufficient to invoke section 427. As the Court of Claims well stated, the dispositive consideration is "the opportunities for manipulation that were present in the situation. We do not intimate that such manipulation or overreaching actually took place but state only that there was opportunity and motive for it." *Valley View Community Hospital v. United States,* 679 F.2d at 863; *see Medical Center v. Harris,* 628 F.2d at 1118. The Court of Claims in *Valley View* examined the arrangements by which Valley View, a non-profit hospital in financial difficulty, simultaneously negotiated three agreements with National, a for-profit hospital corporation, whereby Valley View sold its assets to National, leased them back for a 25-year term, and hired National to manage the hospital at cost. This arrangement tended to increase the rent, a cost which Medicare would subsidize. The court found National and Valley View to be interrelated under section 427 and allowed reimbursement based upon National's cost of ownership, not upon the rent in the lease.

■ Plaintiffs admit that Dr. Papo had check-writing authority; that others also had such authority does not dilute the import of that fact. Letters were addressed to Dr. Papo as "administrator" of plaintiffs' facilities while he was purportedly only in the circumscribed position of medical director, a confusion the hearing officer found had been caused in part by Dr. Papo himself. Several promissory notes dating from March 4, 1971, to July 7, 1972, made by plaintiffs were signed by Dr. Papo as administrator. Dr. Papo secured a loan to SNF by a mortgage on his own residence. The hearing officer heard testimony from plaintiffs' own witnesses that Dr. Papo was the driving force behind the creation and initial management of plaintiffs.

Given this record evidence, the court cannot conclude that the hearing officer's findings of section 427 interrelation should be overturned. This regulation has been in place since 1966, originally at 20 C.F.R. § 405.427 (1967), *promulgated at* 31 Fed. Reg. 14,815 (1966), putting plaintiffs on notice of its possible application to them when they leased a facility from a company majority owned by their medical director. The example of interrelatedness in the Medicare Act regulation is new construction leased from the builder to another company interrelated to it. 42 C.F.R. § 405.427(c)(2) (second sentence). As stated in *Stevens Park Osteopathic Hospital, Inc. v. United States,* 225 Ct.Cl. 113, 633 F.2d 1373, 1379 (1980), section 427 "like other related organization rules is intended to have a 'prophylactic' effect in guarding against bad faith dealing between organizations related

through common control without inquiry into particular circumstances."

The regulation reasonably avoids burdening the intermediary with the task of evaluating the fairness of individual transactions, once relation has been shown. *Id.* MBCA was not required to inquire into the extent Dr. Papo was involved in the lease negotiations, once it was shown that, whatever his title, Dr. Papo was a driving force in plaintiffs' operations. The loan arrangements and testimony before the hearing officer were significant evidence of their relationship. *Chelsea Community Hospital, SNF v. Blue Cross Ass'n,* Medicare Provider Appeal Decision No. 395, at 5 (undated).

*West Seattle General Hospital v. United States,* 230 Ct.Cl. ——, 674 F.2d 899 (1982), cited by plaintiffs, is not to the contrary. *West Seattle* presents the converse of the transaction now before the court: There the provider's stock was being purchased by another company; here the provider is purchasing a leasehold from another company. Moreover, in *West Seattle,* it was not disputed that the transaction was at arm's length and that the stock purchase created the relationship between the parties, whereas Dr. Papo's role in plaintiffs' and CMC's operation existed prior to and during the time the lease was negotiated. Even further, *West Seattle* involved an attempt by the intermediary to split up a merger effected through a stock purchase into two transactions, making the merger an act between related parties even though the initial stock purchase was not. That action demonstrated an aggressive use of section 427. In *West Seattle* the parties initially were at arm's length, but the arms of the parties in this case are intertwined. It need not be shown under section 427 that the grip was vice-like, only that the parties were close enough to apply significant leverage. The Court of Claims noted that section 427 permits application of the regulation without the need for proof by the intermediary that control actually was exercised. 674 F.2d at 904.

The relationship between CMC and plaintiffs was such that it tended to increase the cost of the lease, and the amounts the Medicare program, absent section 427, would subsidize. The statutory scheme of the Medicare Act was that costs of non-Medicare patients would "not be borne" by Medicare. 42 U.S.C. 1395x(v)(1); *Valley View Community Hospital v. United States,* 679 F.2d at 862. No reasonable doubt has been created that section 427 works a deprivation of plaintiffs' substantive due process rights. As the foregoing discussion and the district court's opinion [4] indicate, section 427 has not been applied to plaintiffs in a different manner than to other providers. Plaintiffs' remaining arguments were conceded in oral argument.

Defendant's cross-motion for summary judgment is granted. Plaintiffs' motion for summary judgment is denied, and the petition, therefore, will be dismissed.

IT IS SO ORDERED.

Costs to the prevailing party.

---

4. *See supra* note 3. While the court is not bound by the district court's opinion, that court's discussion of the issue is deemed persuasive.